244

BIRN & WACHENHEIM *v.* UNITED STATES (No. 2887)[1]

United States Court of Customs Appeals, June 6, 1927

*Walden & Webster* (*Edward F. Jordan* of counsel) for appellants.
*Charles D. Lawrence,* Assistant Attorney General (*John F. Kavanagh,* special attorney, of counsel), for the United States.

[Oral argument May 10, 1927, by Mr. Jordan and Mr. Lawrence]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

Merchandise consisting of thin, soft, light, and fluffy white sheets made from wood pulp, having a crinkled or crêped appearance which was produced as an incident in the manufacture and not by any crêping process, laid on, and adhering to, each other, the whole then being embossed with a simple design consisting of diagonal and parallel rows of small squares, pasted onto a sheet of glassine paper, was assessed for duty by the collector at 6 cents per pound and 15 per centum ad valorem, under paragraph 1304, Tariff Act of 1922, as an article in chief value of crêpe paper.

It is claimed by the importers in the court below to be dutiable at 25 per centum ad valorem under paragraph 1303, Tariff Act of 1922, as a manufacture of pulp not specially provided for; or, alternatively, at 35 per centum ad valorem under paragraph 1313, as a manufacture in chief value of paper.

Paragraphs 1303, 1304, and 1313, respectively, read as follows:

PAR. 1303. Filter masse or filter stock, composed wholly or in part of wood pulp, wood flour, cotton, or other vegetable fiber, 20 per centum ad valorem; indurated fiber ware, masks composed of paper, pulp, or papier-mâché, *manufac-*

[1] T. D. 42244.

*tures of pulp*, and manufactures of papier-mâché, *not specially provided for*, 25 per centum ad valorem. (Italics ours.)

PAR. 1304. Papers commonly known as tissue paper, stereotype paper, and copying paper, india and bible paper, condenser paper, carbon paper, coated or uncoated, bibulous paper, pottery paper, tissue paper for waxing, and all paper similar to any of the foregoing, not specially provided for, colored or uncolored, white or printed, weighing not over six pounds to the ream of four hundred and eighty sheets on the basis of twenty by thirty inches, and whether in reams or any other form, 6 cents per pound and 15 per centum ad valorem; weighing over six pounds and less than ten pounds to the ream, 5 cents per pound and 15 per centum ad valorem; india and bible paper weighing ten pounds or more and less than eighteen pounds to the ream, 4 cents per pound and 15 per centum ad valorem; *crêpe paper, 6 cents per pound and 15 per centum ad valorem:* Provided, *That no article composed wholly or in chief value of one or more of the papers specified in this paragraph shall pay a less rate of duty than that imposed upon the component paper of chief value of which such article is made.* (Italics ours.)

PAR. 1313. Papers and paper board and pulpboard, including cardboard and leatherboard or compress leather, embossed, cut, die-cut, or stamped into designs or shapes, such as initials, monograms, lace, borders, bands, strips, or other forms, or cut or shaped for boxes or other articles, plain or printed, but not lithographed, and not specially provided for; paper board and pulpboard, including cardboard and leatherboard or compress leather, laminated, glazed, coated, lined, printed, decorated, or ornamented in any manner; press boards and press paper, all the foregoing, 30 per centum ad valorem; test or container boards of a bursting strength above sixty pounds per square inch by the Mullen or the Webb test, 20 per centum ad valorem; sterotype-matrix mat or board, 35 per centum ad valorem; wall pockets, composed wholly or in chief value of paper, papier-mâché or paper board, whether or not die-cut, embossed, or printed lithographically or otherwise; boxes, composed wholly or in chief value of paper, papier-mâché or paper board, and not specially provided for; *manufactures of paper, or of which paper is the component material of chief value, not specially provided for, all the foregoing, 35 per centum ad valorem.* (Italics ours.)

The merchandise was described in the invoice as "*Zellstoffwatte papier*" (cellulose or wood pulp wadding or padding paper). It was manufactured in Germany. It is represented in the record by Exhibit 1. The manufacturer, Carl Alexander, testified for the importers. He stated that the merchandise was manufactured from "unbleached sulphite cellulose wood pulp;" that it was subjected to a special or washing process "in order to put the fibers into a proper condition to manufacture" the thin sheets of material, of which the imported article is made; that the fibers are then bleached and the "mass is pumped into a vat and from the vat sent on into a dehydrating machine, a machine that draws out water. On this machine the water is drawn from the mass. The stuff is dried and the product is this. (Indicating.)"

In further explanation of the manufacturing processes the witness said:

\* \* \* \* \* \* \*

Q. Mr. Alexander, you stated that the original mass when ready to go on the machine was put in a vat, is that correct?—A. That is correct.

Q. Then what is the next step, what happens after it is put into the vat?—A. From the vat it goes into the machine to draw out the water.

Q. But in what way is it drawn out of the vat?—A. By pumps—pumped out of the vat.

Q. What sort of a machine is in the vat; is there a cylinder in the vat?—A. No; there is no cylinder in the vat, it is scooped out with a pump or otherwise with these scoops. It is an endless belt with cups one way or the other; these cups travel on an endless belt, or it is done by pumping.

Q. After the mass is removed in that way from the vat, where does it go then on the machine?—A. It goes into this machine that draws the water out.

Q. Will you describe that part of the machine which extracts the water from the mass?—A. The mass liberally saturated with water runs over a sieve. The water goes through the sieve and the remaining fiber stuff is dried on steam rollers.

Q. Is dried hot?—A. The stuff is dried on one drum or cylinder which is heated by steam.

Q. Where does it go then on the machine from that drying drum?—A. Coming from that drum it winds itself on a wooden core.

Q. As it comes off that drying drum is it in the condition in which the single sheets in Exhibit 1 appear?—A. Yes.

\* \* \* \* \* \* \*

Q. Look at the crinkled effect in the individual sheets of the padding material in Exhibit 1. State how that is produced.—A. The crinkled effect is not intentionally produced, but is a consequence of the mass drying and drawing itself together.

\* \* \* \* \* \* \*

Q. Mr. Alexander, is the crinkled effect produced after the mass is put on the drying cylinder, or before it leaves the drying cylinder?—A. It takes place upon the drying cylinder.

Q. How is the sheet taken or let off the drying cylinder onto the wooden roll that which you described before?—A. When it has dried on the cylinder it leaves the cylinder, runs upon a felt—when this wadding leaves the drying cylinder it travels on an endless belt of felt to the core upon which it winds itself.

Q. And at the point where this thin sheet leaves the drying cylinder, is there a guide of some sort there to guide it off the cylinder?—A. No, there is no guide. As I understand it, a guide is not necessary because it gathers itself together.

General Appraiser FISCHER. When you say as you understand it, you mean as the witness told you?

The INTERPRETER. Yes.

Q. Just ask him if there is a guide which leads the paper or leaves that thin film off the drying cylinder, irrespective of the question of crinkling. Is there a piece of metal of any kind which guides this paper off the drying cylinder?—A. He speaks of a piece of iron——

Q. Yes.—A. Which prevents the mass from rolling itself again around the cylinder.

Q. It is that piece of iron which acts as a guide to take this mass off the drying cylinder.

General Appraiser FISCHER. You call it a guide and he does not.

The INTERPRETER. He does not admit that it is a guide. He says it is simply a piece of iron in there to prevent the mass from going again around the cylinder.

Q. Then the thin sheet leaves the cylinder at the point where that piece of iron is; did he say that?—A. Yes; then it goes on the felt.

Q. Now, is the crinkled effect produced on the drying cylinder before it reaches the piece of iron that acts as a guide, or whatever else you call it?—A. Partly takes the place on the cylinder, partly before it strikes the iron through the fact of the mass drying on the cylinder it crinkles together, and partly after then it travels on this felt, and before it rolls itself up it kind of draws together again more.

Q. Is this piece of iron which is on the cylinder where the film leaves the cylinder put there for the purpose of producing this crinkled effect?—A. It has nothing to do with it.

Q. At the time this crinkled effect for the first time appears is the sheet of padding wet or dry?—A. Half dry.

 *     *     *     *     *     *     *

Q. The process of manufacture to which you have testified applies, does it not, to the individual thin sheets of padding material in Exhibit 1?—A. Yes.

Q. Will you state how those individual sheets are brought to the condition in which they appear in Exhibit 1?—A. You take from four to ten or more rolls, according to what thickness you desire to have the wadding, and roll the different single sheets together upon one roll.

Q. Did he say they were pressed together then?—A. No.

Q. Simply joined by this roll on one roll?—A. Yes; from the various rolls onto one roll.

Q. How is the embossing or that diamond effect then produced?—A. They are specially pressed in afterwards.

Q. When is this glassine paper put on the article as imported?—A. After these impressions have been made the paper is added, it is pasted on in spots.

Q. The glassine paper is pasted on?—A. Yes; also on a machine, on another machine.

 *     *     *     *     *     *     *

The witness declined to explain the special process to which the wood pulp was subjected. He claimed that the sheets of the padding material were not paper, but wood pulp; that, in order to convert wood pulp into paper it is necessary to subject it to a beating or grinding process, for the purpose of shortening the fibers; that the pulp was not subjected to a beating process; and, as a consequence, the wood pulp fibers were too long for the making of paper; that the secret process to which the pulp was subjected made the fibers soft and fluffy and the pulp "mass more voluminous" than that of which paper is made; that the machine used in the manufacture of the sheets of padding material was not a paper machine; and that paper could not be made thereon. He said that the invoice description of the merchandise was incorrect—although invoices were made out under his supervision—due to the request of American customers that it be called "wood pulp padding paper;" that the correct name for the merchandise is "Cellulose wadding;" and that it is used as a padding in packing candy, chocolate, and soaps.

Other witnesses testified for the importers. They agreed that the merchandise was not a manufacture of paper; that the sheets of material of which Exhibit 1 was made was pulp; and that the mer-

chandise represented by Exhibit 1 was a manufacture of pulp. In explanation, they said: That the machine on which the material was made lacked some of the essentials of a paper-making machine; that it is necessary to subject wood pulp to a beating process in order to convert it into any kind or grade of paper; and that the flimsy sheets of material did not resemble any paper that they had ever seen. They also stated that crêpe paper is the result of a crêping process; and that the crêping may be accomplished by means of an attachment on a paper machine called a "doctor," at the time of the manufacture of the paper, or afterwards by a crêping machine.

The witnesses for the Government testified: That the sheets of material of which the imported article was made was crêpe paper; that the imported article was a manufacture of crêpe paper; that the machine described by the witness Alexander was a paper machine; that the processes to which the imported material was subjected were paper-making processes; and that, while the material of which the imported article was made was flimsy and possessed but little tensile strength, it, nevertheless, was crêpe paper. These witnesses stated that paper is crêped by the special processes described by the witnesses for the importers. They insisted, however, that the involved material was crêpe paper, although the witness Alexander stated that the layers or sheets had not been subjected to a crêping process; and that the crinkled or crêped effect resulted from the "mass drying and drawing itself together."

One of the witnesses for the Government, Ernst Mahler, testified: That he was the general superintendent of Kimberly Clark Co., manufacturers of paper; that his company had made a material, under his supervision, claimed by him and other witnesses for the Government to be paper (represented in the record by Exhibit D), which he said was "absolutely identical" with the imported merchandise (Exhibit 1); that Exhibit D was made, with the exception of the secret process, exactly as the witness Alexander described the method of the manufacture of the imported merchandise represented by Exhibit 1; that it was unnecessary to subject the pulp to the "beating process" in order to make Exhibit D; and that the paper represented by Exhibit D was made on a paper machine.

We think that it would extend this opinion unnecessarily to recite *in extenso* the evidence introduced by the parties. It is not denied that the imported article is in chief value of the padding material.

The court below held, in substance, that the merchandise was not dutiable as a manufacture of pulp under paragraph 1303; that it was a manufacture of paper not specially provided for, dutiable under paragraph 1313 at 35 per centum ad valorem, and sustained the claim in the protest that it was so dutiable.

From this judgment the importers have appealed, and insist that the weight of the evidence fully supports the claim made in the protest that the merchandise is a manufacture of pulp and dutiable as such under paragraph 1303.

We have read the record with care. It is voluminous and consists largely of expressions of conflicting opinions of witnesses expert in the manufacture of paper.

The experts who testified for the importers, including the witness, Alexander, under whose supervision the imported merchandise was manufactured, insisted that the thin, fluffy sheets, of which the imported article was made, were pulp and not paper of any kind or grade.

The witnesses for the Government were just as positive that the sheets of which the imported article was made were crêpe paper and that the article was a manufacture thereof.

It is evident from the opinion of the court below that the evidence was carefully considered.

It may be that the importation is a manufacture of pulp as claimed by the importer; or it may be a manufacture of crêpe or bibulous paper as claimed by the Government. But, after a most thorough and careful study of the evidence, we are unable to reach the conclusion that the decision of the court below, holding that the importation is a manufacture of paper not specially provided for, is contrary to its weight.

For this reason the judgment should be, and is, therefore, *affirmed.*